## PICKERING v. ALYEA–NICHOLS CO.

### UNITED STATES v. SAME.

Circuit Court of Appeals, Seventh Circuit.
July 22, 1927.

Rehearing Denied October 19, 1927.

Nos. 3820, 3821.

**1. Internal revenue ⬅➡38(5)—Attorney in fact for automobile indemnity association, who paid taxes on demand of Commissioner of Internal Revenue, may maintain suit to recover refund.**

Where taxes against automobile indemnity association on issuance of policies, income taxes, and capital stock taxes were paid by plaintiff as agent, attorney in fact, or trustee of association, on demand by Commissioner of Internal Revenue, who assessed taxes, plaintiff *held* entitled to maintain suit to recover refund.

**2. Internal revenue ⬅➡25—That name in which assessment against insurance association was made does not indicate who is taxpayer will not invalidate assessment.**

Capital stock tax, income tax, and tax on issuance of policies, levied against automobile indemnity association, *held* not invalid, in that name in which assessment was made did not indicate who was taxpayer, since names alone cannot change actual conditions, or defeat lawful rights, and it is of small concern whether correct name was employed.

**3. Internal revenue ⬅➡9(7)—Automobile insurance exchange held "association," within**

statute providing for tax on issuance of policies (Revenue Act 1917, §§ 504, 505 [Comp. St. §§ 6309¼a, 6309¼b]; Revenue Act 1918, § 503 [Comp. St. § 6309⅓d]).

Automobile insurance exchange, in which subscribers agreed to pay pro rata proportion of loss of fellow members, *held* insurance "association," within Revenue Act 1917, §§ 504, 505 (Comp. St. §§ 6309¼a, 6309¼b) and Revenue Act 1918, § 503 (Comp. St. § 6309⅓d), relative to tax on issuance of insurance policies.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Association.]

**4. Internal revenue ⬅➡9(7)—Automobile insurance exchange need not be association, to be subject to tax on issuance of policies; "person" (Revenue Act 1917, §§ 504, 505 [Comp. St. §§ 6309¼a, 6309¼b]; Revenue Act 1918, § 503 [Comp. St. § 6309⅓d]).**

It is not essential that automobile insurance exchange, in which subscribers agreed to pay pro rata proportion of loss of fellow members, be classified as "association," in order to be subject to tax its issuance of insurance policies, in view of Revenue Act of 1917, §§ 504, 505 (Comp. St. §§ 6309¼a, 6309¼b), and Revenue Act 1918, § 503 (Comp. St. § 6309⅓d), providing for such tax against "person," which includes plural.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Person.]

**5. Internal revenue ⬅➡9(7)—Whether automobile indemnity insurance business is conducted for profit is immaterial, in levying policy tax (Revenue Act 1917, §§ 504, 505 [Comp. St. §§ 6309¼a, 6309¼b]; Revenue Act 1918, § 503 [Comp. St. § 6309⅓d]).**

Whether automobile indemnity insurance business is conducted for profit is of no importance in determining whether insurer is subject to tax on issuance of policies, under Revenue Act 1917, §§ 504, 505 (Comp. St. §§ 6309¼a, 6309¼b), and Revenue Act 1918, § 503 (Comp. St. § 6309⅓d).

**6. Internal revenue ⬅➡9(7)—Policy tax against automobile indemnity insurance association cannot be avoided on plea that subscriber's participation is so slight he cannot be said to transact business of insurance (Revenue Act 1917, §§ 504, 505 [Comp. St. §§ 6309¼a, 6309¼b]; Revenue Act 1918, § 503 [Comp. St. § 6309⅓d]).**

Where automobile indemnity insurance association built up large business and issued thousands of policies, tax on issuance of such policies, under Revenue Act 1917, §§ 504, 505 (Comp. St. §§ 6309¼a, 6309¼b), and Revenue Act 1918, § 503 (Comp. St. § 6309⅓d), may not be avoided on plea that participation of each subscriber was so slight that he cannot be said to have transacted business of insurance.

**7. Internal revenue ⬅➡9(7)—Policy tax against automobile indemnity insurance association held not defeated on ground that premiums were advance deposits to insure payment of subscriber's share of loss (Revenue Act 1917, §§ 504, 505 [Comp. St. §§ 6309¼a,**

6309¼b]; Revenue Act 1918, § 503 [Comp. St. § 6309⅓d]).

Tax, under Revenue Act 1917, §§ 504, 505 (Comp. St. §§ 6309¼a, 6309¼b), and Revenue Act 1918, § 503 (Comp. St. § 6309⅓d), on issuance of policies in automobile indemnity insurance association, cannot be defeated on ground that premiums were advance deposits to insure payment of subscriber's share of loss, since liability for tax does not depend on time premium is paid.

**8. Internal revenue �köö7(31)—Automobile insurance exchange held properly required to pay income tax on interest from investments of premium receipts and reserves.**

Automobile indemnity association, under which subscribers agreed to pay pro rata proportion of loss of fellow members, *held* properly required to pay income tax on interest from investments of premium receipts and reserves.

**9. Internal revenue �köö9(26)—Automobile insurance exchange held properly required to pay capital stock tax.**

Automobile indemnity association, under which subscribers agreed to pay pro rata proportion of loss of fellow members, *held* properly required to pay capital stock tax.

In Error to the District Court of the United States for the Southern Division of the Southern District of Illinois.

Separate actions in assumpsit by the Alyea-Nichols Company against the United States and against John L. Pickering, former Collector of Internal Revenue for the Eighth District. Judgment for plaintiff (12 F.[2d] 998), and defendants bring error. Reversed and remanded.

The judgments assailed by these writs are for $46,402.03 and $11,912.06, respectively, both including interest, for refund of taxes held to have been unlawfully levied and collected by the United States. The cases were tried together in the District Court, where jury was waived, and heard together here. The actions were in assumpsit, the first brought against Pickering, former collector of internal revenue, to recover taxes assessed by Commissioner of Internal Revenue against "the Belt Automobile Indemnity Association," being (a) taxes on issuance of insurance policies under section 504, Revenue Act 1917 (Comp. St. § 6309¼a), issued in December, 1917, January to December, inclusive, 1918, and January to April, inclusive, 1919, and under section 503, Revenue Act 1918 (Comp. St. § 6309⅓d) for May, 1919, to April, 1921, inclusive, amounting to $33,-059.24; (b) income taxes for years 1917, 1918, 1919, and 1920, amounting in all to $678.77; and (c) capital stock taxes from July 1, 1918, to June 30, 1921, amounting to $126. The other action was brought under

the Tucker Act against the United States to recover taxes likewise assessed by Commissioner of Internal Revenue against the Belt Automobile Indemnity Association, being taxes on issuance of insurance policies for May to November, inclusive, 1921, $8,755.67; income taxes for 1920, $630.02; and capital stock tax, July 1, 1921, to June 30, 1922, $48.

The plaintiff in each action described itself as an Illinois corporation suing "as attorney in fact for the subscribers at Belt Automobile Indemnity Association, an interinsurance exchange organized and existing under and by virtue of the laws of the state of Illinois." Beginning in 1915, contracts of automobile insurance under what is called the interinsurance plan were put out through these attorneys in fact, or their predecessors, under authorization by the insurance department of Illinois. The statute authorizing this to be done was section 13½ (adopted in 1912) of the so-called Mutual Casualty Act of Illinois (Hurd's Rev. St. 1913, c. 73, § 321½), the authorizing proviso of which is: "Provided, however, that the insurance superintendent may authorize individuals, firms, and corporations, by themselves or their attorney in fact, to provide among themselves insurance or indemnity to each other, of the kind provided for in this act, through the medium of reciprocal or interinsurance contracts, if, in his opinion, the plan proposed and the financial strength of the parties in interest will properly safeguard the interest of the insured."

It appears no general regulations thereon were promulgated by the insurance department, but that all plans for such insurance were required to be submitted to and approved by the department before business thereunder could be transacted. Practically all of the business involved in the first suit was transacted under this statute. The forms of power of attorney and application for insurance, and of the contract, approved by the insurance department, indicate the nature of the transactions thereunder and the relations between the subscribers with each other and with the attorney in fact. The form of the power of attorney and application is:

"The association will not accept application for any kind of insurance on a taxicab. * * *"

"At the Belt Automobile Indemnity Association of El Paso, Illinois, U. S. A.

"Subscriber's Power of Attorney and Application.

"The office of the Alyea-Nichols Company in El Paso, Illinois, having been selected by

automobile owners as a place at which they may exchange contracts of insurance, such place being designated as 'the Belt Automobile Indemnity Association,' I, as a subscriber thereat, hereby appoint the Alyea-Nichols Company my attorney in fact, with power to substitute any other person or persons that said attorney may select, subject to the approval of the advisory committee.

"Said attorney shall exchange for me with other subscribers at said association, contracts of insurance, and shall have power to make, issue, change, modify, reinsure or cancel contracts containing such terms, clauses, conditions, warranties and agreements as said attorney shall deem best (provided, however, my attorney shall not make me jointly liable with any other subscriber, but shall bind me separately and alone, and for not more than my pro rata share on any one contract); to demand, collect, receive and receipt for all moneys due me, or for credit to my account as a subscriber; * * * to accept service of process and appear for me in suits, actions, or proceedings under contracts issued at said association, and bring, prosecute, defend, * * * or adjust same; to perform every act not herein mentioned that I could myself do in relation to any contract hereby authorized.

"Said attorney is hereby further authorized for me to execute * * * documents and to do any acts necessary to effect compliance with the laws of any state * * * with respect to the exchange of insurance, * * * also to appoint the insurance superintendent * * * of any state my agent on whom service of process may be had in any suit, * * * brought under any policy issued at said association. There shall be no joint funds, capital or stock, but my attorney shall keep a separate account open to my inspection of all moneys paid by me as a result of this instrument.

"An advisory committee consisting of five subscribers to act for one year shall be selected at each annual meeting of subscribers. * * * If a member of the advisory committee shall cease to keep his insurance in force at the association, he shall cease to be a member of such committee, and the remaining members thereof shall have power to fill the vacancy.

"The attorney in fact shall receive as compensation the three years' application fee, * * * also a transfer fee of $1.00 * * * each time my policy is transferred from one automobile to another owned by me, and 10 per cent. commission on all other money deposited or paid by me on account of this contract. From the compensation above provid-

ed, said attorney shall pay all expenses incident to the conduct of said association, except the items hereinafter mentioned.

"For the payment of losses, legal and adjustment expenses, insurance department fees and charges, taxes, premiums on surety bonds, and stationery and postage for collecting subscribers' deposits, I agree to deposit with the attorney in fact, from time to time, when called for by said attorney, a sufficient sum of money to pay my equitable proportion of the items last mentioned. From the gross amount of such deposits so made, my attorney shall pay said expenses, charging each subscriber's deposit with his equitable share thereof. The attorney in fact is also to be allowed, as part of its compensation as above provided, 10 per cent. commission on all deposits made by me under this provision. Any subscriber failing to deposit the amount called for by the attorney within * * * shall forfeit all his rights as a subscriber at said association so far as losses subsequently incurred by him are concerned. * * *

"Subscribers' deposits shall be kept in banks, or invested in securities, approved by the advisory committee, and all disbursements therefrom shall be by check of the attorney in fact. * * *

"This instrument may be revoked * * * by either party giving to the other five days prior notice in writing. * * * Thereupon my attorney shall cancel all unexpired insurance granted by me, or to me, under this instrument, liquidate my account and return to me my unused deposits, less the 10 per cent. commission thereon. * * *

"Application fees for three years—fire, and theft, $7.50; collision, $7.50; liability and property damage, $7.50.

"The undersigned * * * hereby subscribes to the above agreement and makes application for insurance for a period of three years at the Belt Automobile Indemnity Association, located at El Paso, Illinois. * * * For the purpose of obtaining insurance, I warrant * * * to be true, and my insurance hereby applied for is to be considered as subject to said warranties. * * *

"I agree that the association is not bound by any knowledge of or statement made to or by any agent or solicitor. * * *

"Advance Premium Voucher.
Amount of advance premium collected $——
Reduction for commission............ $——
Net amount forwarded with application $——"

The contract or policy form is:
"Subscribers at the Belt Automobile Indemnity Association, El Paso, Illinois (here-

in called 'Association'), do hereby severally agree to indemnify * * * on the automobile described * * * against actual loss or damage * * * in an amount not to exceed ——— dollars. * * *.

"The maximum amount of insurance collectible under this policy shall not be in excess of the following scale: * * * On an automobile on which the association allows a special amount of insurance. * * * Each month the association's liability shall automatically decrease: * * * Provided, * * *. there shall be deducted the sum of $25 and the association shall be liable for the loss in excess of that amount only. * * *

"The subscriber suffering loss * * * shall immediately notify * * * the attorney in fact of this association. The association shall be allowed sixty days * * * to find or locate the automobile. * * * If the property stolen * * * shall be paid for as a total loss and * * * be subsequently found and recovered, it shall become the property of the association and shall be sold by the attorney for the best price obtainable and the proceeds credited to the individual accounts of the proper subscribers. * * *.

"The association shall not be liable on any such collision claim for any amount in excess of the following scale: * * * On an automobile on which the association allows a special amount of insurance. * * *.

"Property Damage.—The liability of this association for loss or damage described in this clause is limited to not more than $500.00 for any one accident. * * *

"Defense.—The association will also defend in the name and on behalf of the subscriber or other person or persons covered, any suits, even if groundless, brought against the subscriber or other person or persons covered * * * where the loss sustained by subscriber * * * would be covered by this policy.

"Costs.—In addition to the coverage granted above, the association will also pay the costs and expenses * * * in any legal proceeding defended by this association. * * * The association shall not be liable beyond the actual cash value of the automobile destroyed; * * * the sum for which this association is liable pursuant to this contract shall be payable sixty days after due notice * * * received by the attorney. * * * It shall be optional, however, with the association to repair, rebuild or replace said automobile, * * * but there can be no abandonment to the association of the said automobile.

"The entire policy shall be void * * *

if the interest of the subscriber in the subject of this insurance be other than unconditional. * * *. The subscriber * * * shall immediately forward to the attorney every notice * * * or other process served upon them on behalf of third persons when the association will, at its own cost, defend in the name and on behalf of the subscriber * * * covered by this policy.

"Cancellation.—This contract may be canceled by either of the parties upon giving five days' prior written notice to the other. * * *. Notice of cancellation * * * to * * * address as shown by the records of the association, shall be sufficient notice.

"Method of Recovery.—In the event of litigation, to avoid a multiplicity of suits, no suit or other proceeding at law or in equity shall in any event be begun or maintained for the recovery of any claim upon or by virtue of this contract against more than one of the subscribers at this association at any time, nor in any court other than the highest court of original jurisdiction, and the process in such suit or proceeding, wherever filed, shall be served at least ten days prior to the first day of the term of court to which it is returnable upon the attorney in fact in El Paso, Illinois, or elsewhere, or upon the insurance superintendent or corresponding official of the state where the suit is filed, appointed by the attorney in fact as agent for such service of process, and the final decision in such suit or other proceeding shall be taken to be decisive of a similar claim so far as the same may subsist against each of the subscribers at the association absolutely fixing his liability in the premises, and the final judgment in such suit or other proceeding shall be enforceable against the funds of the subscribers liable therefor, deposited by them with the attorney in fact, or advanced by such attorney in fact as guarantee fund. Each of the subscribers at the association, in consideration of this entire stipulation, so far as he individually is, or may be, concerned, expressly agrees to accept and abide by the result of such final decision in the same manner and to the same effect as if he had been the sole defendant in a similar suit or proceeding as to a similar suit against him so far as the same may subsist, save and except, however, as to the matter of costs and disbursements and the attorney is hereby authorized as to each subscriber at this association to receive and admit service of process in any suit or other proceeding begun and maintained as aforesaid.

"Subrogation.—Upon payment of any loss the association shall be subrogated to the extent of such payment to all rights of recovery by the subscriber against any third party,

firm or corporation, and the subscriber shall fully co-operate with the association to secure to it such rights. The association may take over and conduct in the name of the subscriber the defense or prosecution of any claim or suit for indemnity, damages or otherwise against any third party, firm or corporation.

"Character of Association.—The subscribers at the Belt Automobile Indemnity Association are individuals, firms or corporations that have each executed an agreement (hereby made a part hereof) which vests in the Alyea-Nichols Company, herein called 'attorney,' power to issue this contract for them. It is understood and agreed that there is assumed by each subscriber, severally, and not jointly with any other subscriber, a portion of the aggregate liability hereunder not in excess of his equitable pro rata share thereof, considering the aggregate amount of all deposits, made for the period in which the loss may occur, by subscribers carrying the same kind of insurance at the association at the time of the loss.

"Any subscriber failing to deposit the amount called for by the attorney within thirty days from the date such call is mailed, directed to him at his last known address as shown by the records of the association, shall forfeit all his rights as a subscriber at said association so far as losses subsequently incurred by him are concerned: Provided, he may be reinstated within such time and for such period and on such terms as may be stipulated by the attorney in fact; and provided further that all losses and claims arising or occurring, or all accidents happening after such forfeiture of subscriber's rights and prior to date of reinstatement shall not be covered or allowed by said association.

"In witness whereof, the subscribers at the Belt Automobile Indemnity Association have caused these presents to be signed by their attorney at El Paso, Illinois. * * *

"Important.—Read Your Policy. * * * Notice to an agent is not notice to the association."

Section 13½ was repealed by the act entitled "An act concerning the business of reciprocal or inter insurance" in force July 1, 1921 (Laws, Ill. 1921, p. 492). This act made specific provision for doing substantially those things embodied in the above recited power of attorney, application, and contract in the manner therein specified, and these continued to be the same after as before the adoption of the act, so that the relations of the parties were not thereby materially changed, and the same forms continued to be used.

The new act made provision for a minimum number of subscribers to entitle such a company to do business, and for a minimum amount to be on hand before the company started business, and for a reserve, to be maintained at certain relation to the liability; but these things were substantially required by the department before the passage of this act as a condition for transacting business, and all these requirements were met by this concern.

E. H. Horton, of Washington, D. C., for plaintiffs in error.

C. W. Armstrong, Jos. W. Cox, and Rufus Potts, all of Chicago, Ill., for defendant in error.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] As to the facts there is no controversy. The taxes in question were assessed by the Internal Revenue Commissioner, and on his imperative demand paid by or through defendant in error as agent, attorney in fact, or trustee, and in the same capacity it seeks refund. Under the circumstances it alone could and did produce the funds required to pay these taxes, and if they were unlawfully levied the government is in no position to narrowly question the right of defendant in error to maintain the suits for refund; and its contention that defendant in error has no right or title to maintain the suits is not sustained.

[2] For defendant in error it is contended that even if the government was entitled to the taxes—especially the policy issuance tax—it was not entitled to them from the Belt Automobile Indemnity Association, in which name the assessment was made, and that therefore the assessment and collection were void. Passing the government's contention that no assessment was necessary, we are not impressed by the force of the suggestion that the name in which the assessment was made did not indicate who was, in fact, the taxpayer. If the taxes were payable, and were paid, it is of small concern whether the correct name or capacity was employed. Names alone cannot serve to change actual conditions or to defeat lawful rights.

[3] Tax on issuance of insurance policies constitutes the large bulk of the demand in each case. Section 504 of the Revenue Act of 1917 provides for levy and collection of "the following taxes on the issuance of insurance policies: * * * (c) Casualty Insurance. A tax equivalent to 1 cent on each dollar or fractional part thereof of the premium charged under each policy of in-

surance or obligation of the nature of indemnity for loss, damage, or liability * * * issued or executed or renewed by any person, corporation, partnership, or association, transacting the business of * * * automobile, or other branch of insurance. * * * "

Section 505 (Comp. St. § 6309¼b) makes provision for "every person, corporation, partnership, or association, issuing policies of insurance upon the issuance of which a tax is imposed by section 504" to make monthly return of and pay such tax. The Revenue Act of 1918, in somewhat different arrangement and wording, is to same effect.

Apart from the exception in case of insurance by fraternal societies having lodges, and the like, the sections are all-inclusive, and the only question respecting these policy taxes is whether this concern falls within them. It is the contention of defendant in error that "Belt Automobile Indemnity Association" indicated merely a place, and that the "subscribers" constituted neither a corporation, association, nor insurance company, nor body of any kind, and much of the briefs on both sides is devoted to the proposition whether or not this is an association. The many cases cited on the subject of what does or does not constitute an association within the meaning of various statutes of different states, are not particularly helpful here. We are of opinion that the Revenue Act does not employ the term in any narrow or technical sense. It is defined in Black's Law Dictionary: "The act of a number of persons who unite or join together for some special purpose or business. The union of a company of persons for the transaction of designated affairs, or the attainment of some common object. An unincorporated society." And in 1 Bouv. Law Dict. 269: "The act of a number of persons in uniting together for some purpose. The persons so joining."

If, in the transaction of this business, the subscribers were associating, or coacting, or co-operating in any way to carry it on, they constituted an association, within the meaning of the act; and this quite regardless of what, as between themselves, or between them and their attorney in fact, the contractual or financial or bookkeeping arrangements were. Without such coaction or co-operation it is more than apparent this large business could not have been created. The statement sets out quite fully the instruments whereunder the subscribers are acting through their "attorney in fact."

Let us assume there are say 50,000 subscribers in this so-called "exchange." It would be a practical impossibility for each to act for himself. There must not only be a common plan, but a co-ordinating agency. If each of the 50,000 undertook to make with the others such indemnity contract as he saw fit, each unrelated to the other, and without preconcerted uniformity of purpose and plan, nothing could possibly have been achieved. If all should meet together and agree upon a plan and carry it out through successive meetings, there would clearly be an association of the individuals. If each one constituted a different person as his attorney in fact, to act for him in the matter of granting and receiving indemnity, and these co-operate accordingly, the various attorneys, for their principals, would be associated for such purpose and it would be an association of individuals acting through their attorneys.

Is it any the less an association if each subscriber appoints and constitutes the same person as his attorney in fact, and the business is conducted through this attorney? He is none the less the agent for each of the others, and it is they, through the attorney, who are agreeing upon the form of application and power of attorney, and of the contract of indemnity, and all of the various steps and acts necessary to build up such comprehensive and extensive business of insurance. The fact that the attorney is the same in each case makes it none the less an association of the various principals acting through the attorney. Through this attorney the principals cohere in the inauguration and continuance of the common plan, to which each of the subscribers is committed by his application, power of attorney, and contract of indemnity. New subscribers become part of the association.

To constitute an association within the meaning of the act, it is not requisite that each constituent should be coordinate or hold the same relation. A very important and indispensable element here is the so-called attorney in fact, who is not merely and simply an attorney in fact as ordinarily understood. With the attorneyship there is coupled a decided interest which permeates and colors the entire plan. It is the attorney who in practice and by contract inspires and dominates it, and around whom the business is built. His power is irrevocable. He is not removable, and his power of substitution is limited only by a veto of a so-called "advisory committee," which the subscribers annually choose, and which has practically no other material function save that investment of funds by the attorney is with the advice and consent of the committee. The attorney has absolute power over who may be accepted as subscribers; what the rates of indemnity shall be; what the subscribers must pay from

time to time (limited, presumably, by the necessities of the concern) ; the cancellation of contracts, and thus the ending of the subscriber's relation; the settlement and payment of losses, compromise of claims; and, in practical effect, every power of a corporate board of directors, plus many important powers which such boards do not have.

The attorney receives for his services in his controlling capacity of permanent and irremovable manager of the concern, from each subscriber on his application for insurance, whereby on acceptance he becomes a subscriber, $7.50 for each one of the three classes of insurance which may be applied for. This is an "application fee." He also receives $1 for each transfer of the insurance to another automobile of the same owner; also 10 per cent. of all assessments or premiums or deposits by the subscriber, under whatever name made. True, the expenses of the office, and of obtaining the insurance are paid therefrom; but the losses, expense of investigation, attorney's fees, and all other expense, including taxes, are paid from the 90 per cent.

It is thus apparent that this functionary is far more than an attorney in fact. He is the very pulsating heart of the concern, the subscribers supplying the blood. This is not said in derogation of the organization or of the plan, with the merits or demerits of which we are not concerned. It has evidently thus far proved successful—at least in the numbers of such organization in the many states which have authorized them, as well as in the number of subscribers—and for the purpose hereof its merit may be assumed. These conditions are pointed out to indicate that the subscribers and the so-called attorney are all co-operating together to make possible this result, all constituting an association without which the business would not exist. From what appears we are satisfied this concern falls fairly within the designation of "association" as employed in the act which imposes the tax.

[4] But it is not essential that this thing be classified as an association in order to subject to tax its issuance of insurance policies. The statute also says "person." This, of course, includes the plural; and if these persons, whether or not technically constituting an association, issue insurance policies, whether unto themselves or to others, the tax is payable. So, if we treat all the participants as persons transacting the business, the act subjects them to the tax.

Perhaps what has been said sufficiently answers the earnest contention which defendant in error makes that Belt Automobile Indemnity Association is but the name of the place where the business is transacted, and in no sense the name of an organization or association of the subscribers; but again we say that the name is not material. The right to tax does not depend upon the name. The taxable concern may have any name, or no name at all. The Illinois statute of 1921 (section 3) on the subject of interinsurance requires that there be "a name of, or designation under which such contracts are to be issued," and if the name indicated is not the name of this concern, it has no name. That a name would be a great convenience, and, indeed, is almost indispensable, is apparent from a reading of the instruments set out in the statement, where the concern is repeatedly designated as "Belt Automobile Indemnity Association" or "association" without any reference to a place. At the very beginning of the power of attorney it is stated, "Association will not accept application," etc., and the contract is replete with references to what the association will and will not do, concluding with the statement that notice to an agent is not notice to the association.

It is further urged that the subscribers were each extending insurance to the others; that these are separate, individual transactions, in no way connected; and that what is paid by each subscriber is not a premium but an advance deposit against which is charged, from time to time, the subscriber's proportion of expense of the business and all losses paid to subscribers. The contention is, in effect, that each subscriber issues say 50,000 separate, several, and distinct contracts of indemnity, for the fifty-thousandth part of the loss (if the policies and indemnity were all alike) accruing to any one subscriber, and that at most the individual alone would be liable for the tax on his separate undertaking. This might have force if, in practice, the policies were so issued and premiums and losses paid.

But such is far from the fact. There is collected in advance a premium equal to the estimated cost to the subscriber of carrying the insurance for a stated period, and as this advance is used to pay losses and expenses, another premium is levied and collected for another stated period. If more is required more is, from time to time, demanded; if less is needed, the demands are less. The amount is fixed by the controlling factor, the attorney, and if not paid the insurance ceases, and the relations of the subscriber are terminated. When a loss occurs the attorney alone adjusts it and pays it in a lump sum out of the accumulated funds in his hands. Investments are made by the attorney, and reserves maintained out of the funds not immediately

required, and from all outward indications the business is run by the so-called attorney in fact in the same general way as any large business would be run either by a corporation or by individuals.

[5] Indeed, in the issuance of policies and collection of premiums there is no great difference in principle between this and insurance of the most orthodox type. Premiums in the latter, it is true, are fixed, and there is an absolute assumption of liability, usually by a corporation, or it may be under some mutual form. But in the last analysis it is the premiums out of which the expenses and losses are paid; otherwise the concern must eventually quit. The fact that the business is or is not conducted for profit is of no importance on the proposition of taxation.

The utter impracticability of the 50,000 each undertaking independently to indemnify each of the others, is so apparent as to dispel the conclusion that each subscriber is independently and unqualifiedly the indemnifier of all. Whatever the plan of bookkeeping may be, the premiums are paid in and received in their entirety, banked, invested, or otherwise held as a whole, and losses, expenses and other disbursements undividedly paid without action by or reference to the subscribers, individually or collectively, or contributed by them other than their payment of premiums.

[6] Asserting that the contract is but the individual undertaking of each subscriber; and that the subscriber is not "transacting the business of automobile insurance," the claim is made that therefore no tax accrued. It goes without saying that in the placing of this indemnity, involving in a few years several millions of dollars of premiums, a large business of insurance has been transacted, and some person, association, or corporation has transacted it and actually issued the policies and received the premiums. If the co-operative subscribers and the attorney have contrived to carry on and build up this very large business of insurance, and to issue these thousands of policies, the tax thereon may not be avoided on the plea that the participation of each subscriber was so slight that he cannot be said to have transacted the business of insurance.

It is upon the *issuance of the policy*, or contract of indemnity, that the tax is imposed, the amount being measured by the premium paid. The policy or contract of indemnity was issued as an entirety by the central agency, and thus fixed the liability to taxation for issuance under the Revenue Act, and the amount of the tax payable was fixed by the premiums which were received through the same agency.

[7] We find no merit in the contention that these are not premiums, but mere advance deposits to insure payment of the subscriber's share of losses and expenses. This is, in effect, the basis of all insurance in one form or another, which is to distribute among the many the burden of losses accruing to the few. The liability to tax for issuance of the policy in no measure depends upon the time when the premium is paid, whether by way of advance deposit before the loss, or collected after loss occurs. It is payment made in consideration of the indemnity afforded, and is, in every fair sense, premium as that term is understood.

The power of attorney itself authorizes the attorney to pay "taxes" out of the premium receipts; presumably all lawful taxes; whether on the accumulated funds or property in the attorney's hands, or excise taxes such as might be levied on the issuance of policies; and presumably not taxes on 50,000 individuals, each on his individual contract to indemnify each or all of them. Even though the tax, when paid, would be apportioned among the several subscribers, its initial payment by the attorney was evidently contemplated by all concerned.

[8, 9] What has been said applies likewise to the other items in issue—income tax aggregating $1,309.79, and capital stock tax, $174 (both without interest). The income tax was on interest from the investments of the premium receipts and reserves, and the capital stock tax was on items on which, under the Revenue Law, an association would have been subject to the tax.

The judgment is reversed, and the cause remanded to the District Court for further proceedings in harmony with these views.